THE PEOPLE v. JOHN GORDON.

*Arrests—Decoying—Prosecution must not suppress facts in favor of accused—Possession of stolen goods not necessarily evidence of burglary.*

Where an arrest was made under circumstances indicating an understanding between the police and a confederate of the arrested person that the confederate should go free if he decoyed the other into the power of the police, full latitude should be allowed in cross-examining the police upon matters that would be likely to disclose such an arrangement.

One cannot be arrested for felony without sufficient reasons of belief if not taken in the act.

The suppression by the prosecution of facts favoring a person on trial for crime is rebuked.

A person convicted of burglary was named as a witness on an information against another for the same offense, but the prosecution did not call him. *Held* that they were bound to produce his testimony, and that the accused was entitled to the benefit of every inference that could be drawn from its suppression.

Possession of a satchel containing stolen property was *held* to have no tendency in itself to show one guilty of burglary.

Exceptions certified before sentence from the Recorder's Court of the city of Detroit. Submitted April 23. Decided April 24.

BURGLARY. The facts are given.

Attorney General *Otto Kirchner* for the people.

*Hawley & Firnane* for the respondent. When one reasonably accounts for his possession of stolen property, the prosecutor must show that his statement is false, 3 Greenl. Ev., § 32; *Jones v. State*, 30 Miss., 653; *Reg. v. Crowhurst*, 1 C. & K., 370; *Garcia v. State*, 26 Tex., 209.

CAMPBELL, C. J. Defendant was convicted of burglary in the alleged nocturnal breaking and entering of the house of one Charles L. Stevens, in Detroit, and

stealing a quantity of silver and other small articles therefrom. The only evidence connecting defendant with the offense was his arrest with a satchel containing the articles. The only evidence of the burglary was that the house, which was temporarily unoccupied except by a brother of the owner sleeping in it, was entered through a window in the front; that a lamp which belonged in the kitchen was found unlighted in the front hall; and that a clock had stopped at five minutes past eight, and that its door had been opened and it was not run down.

This case was before us at the last October term, and some of the questions now before us were somewhat considered. It seems to us that some things which were then passed upon do not appear to have received full consideration on the second trial.

It appears from the evidence for the prosecution that on the evening of the arrest, at a late hour, one O'Neil saw prisoner and two men named White and Hardy walking up Jefferson avenue and prisoner was carrying a satchel. This was near Third street. He at once walked up Jefferson avenue to Cass street, three blocks, to notify a policeman, and there found policemen John Dacy and Michael Fitzpatrick, and told them, and they answered, "That is the party we are waiting for." Dacy stopped them, and Fitzpatrick asked them if they were the three who had been in Whitson's saloon. They answered, no. Dacy asked where they came from, and Gordon answered, 'from the Central depot,' and struck Dacy, dropped the satchel and ran. Fitzpatrick struck White and arrested him. No attempt was made to arrest Hardy. Dacy and Fitzpatrick swore to seeing Gordon, White and Hardy in Whitson's saloon between 11 and 12. There was no evidence in the record showing any acts or sayings of any of these parties in the saloon throwing any light on the case. Dacy swore that he saw Hardy afterwards and did not arrest him, and was told by roundsman Somerville that he was not wanted. He also swore that he heard detective Sullivan say in the

station house at the same time that they were looking . for Gordon, who was afterwards taken.

Dacy was asked, but the court refused to allow the question to be answered, whether on the evening of the arrest, or the day following, he saw detective Sullivan and heard him claim that he knew all about the affair, and that if Dacy and Fitzpatrick had not bungled the matter, Gordon as well as White would have been arrested; and further, whether Sullivan did not give him to understand that Hardy had given him notice or warning, and that Hardy was taking them where they would be easy to arrest.

We cannot see on what principle this was ruled out, and we think it within our previous decision. It was certainly a very singular circumstance that these men, who were shown by the prosecution to have been together an hour or two before the arrest, were waited for and expected by police officers and by O'Neil, without any attempt to arrest them earlier. It is also very strange that Hardy, who was with the others at the place referred to by the arresting party, was not seized at all. It is impossible to account for the conduct of these persons except on the manifest ground that some one knew of the burglary if there was a burglary, and that whether honestly or dishonestly, it had been determined to take White and Gordon and leave Hardy out. There could have been no cause for arresting any of them unless information had been received from some one having knowledge of facts, or unless the whole affair was a fraudulent device of somebody to injure one or more of the two persons arrested.

There is no right to arrest persons not taken in the act of felony without sufficient reasons of belief, and if there were any in this case the conduct of O'Neil and the officers shows conclusively that the knowledge or suspicion had been received earlier from some peculiar source, and that there must have been some unexplained reason for the delay.

The questions put to Dacy related directly to the subject matter of the arrest to which he had testified, and to the reasons for the arrest. If the arrest was dishonestly planned it would certainly have some bearing to show what the plot was; and this could hardly fail, if disclosed, to furnish means of clearing up the circumstances which were ambiguous. If honestly made it would be equally pertinent. The idea that it is either commendable or justifiable in the administration of criminal law to attempt to suppress facts which bear favorably on the accused is a dangerous one. Any prisoner on trial ought to have full opportunity to bring out all the surroundings of the transaction with which he is claimed to be involved. It seems to us that it was extremely important in this case to know how and why this arrest was brought about.

The subsequent course of proof made this appear more evidently, because there was much reason to claim some sort of complicity between Hardy and some of the police force, and whatever it may have meant, the prisoner had a right to show it. But in Dacy's case the questions put were in the direct line of proper cross-examination upon the matters to which he had testified in chief, and we can see no reason for their exclusion on any ground.

We have referred to this point because it had a decided bearing on other things arising in the cause, and the ruling probably influenced the result.

We think as the case stood the jury should have been directed to acquit the prisoner. As already suggested, the only evidence of burglary by any one was in the fact that a window was opened at some time unknown; that a clock was found stopped at a few minutes past eight, and an unlighted lamp in a place where it was said not to belong. It would require a lively imagination to discover what object burglars could have in stopping a clock, although such devices may sometimes be resorted to for creating false appearances

by those whose ingenuity is directed towards throwing suspicion on others. Actual criminals seldom resort to such foolish expedients on their own account.

The other facts were so ambiguous that the prisoner was entitled to the benefit of all ambiguities. His possession of the satchel alone, even if a guilty one, had no tendency of itself to show him guilty of burglary.

The prosecution had in court a witness named on the information, convicted of the charge, who was in the custody of the law, and who must necessarily have known the facts. Their suppression of this positive testimony which they were on every consideration of justice bound to produce, entitled the prisoner to every inference that could be drawn from it. There was no evidence that the prisoner had been seen near the house, and no other proof to connect him with any offense in it, and under all these circumstances a conviction would be so purely guess work as not to be maintainable.

The prisoner's statement, if believed, would have shown him to have been the victim of a scheme of Hardy and some police agent, and the testimony to show such a scheme was practically shut out. It would be unjust to these parties to hold that their guilt appeared from this record. But there was quite as strong circumstantial evidence that some one had conspired against Gordon as of his own guilt, and we do not think him lawfully convicted. It must be certified that the conviction was erroneous, and that the respondent should be discharged and the prosecution discontinued.

The other Justices concurred.