## TOM CARTER v. THE STATE.

*No. 3927.    Decided December 19.*

**1.   Murder—Manslaughter—Homicide by Mistake of Party—Charge of Court.**—Where it appeared, on a trial for murder, that defendant was summoned as one of a constable's *posse* to arrest a negro at night, who it was supposed was intending to commit a felony, the constable having no warrant for such arrest, and deceased was killed by the *posse* through mistake for the party they had intended to arrest, he having opened fire on the *posse* after they had attempted to stop him, *held,* that if the *posse* were *bona fide* intending an arrest, though illegal and without a warrant, the offense might have been of no higher grade than manslaughter, and it was error in the court to omit to charge the law of manslaughter.

**2.   Same—Necessity for Charge to Submit Law Applicable to all Defensive Issues.**—Inasmuch as it is the duty of the jury on a trial for homicide to judge of the attendant facts from the standpoint of the defendant, the charge of the court should submit to them all the law legitimately and fairly arising upon the evidence which he has adduced in his defense, whether the court may believe it true or false.

**3.   Intent in Crime—Illegal Arrest.**—In determining criminality, it is a general rule that there can be no felony without a felonious intent; and it is the intent which characterizes the act, and not the act which characterizes the intent. If the intent of defendant was only to make an illegal and unwarranted arrest, and in endeavoring to do so he was forced to take the life of the party whom he was seeking to arrest, the offense which he was about to commit being false imprisonment, which under our law is a misdemeanor, and not a felony, such offense would be considered in estimating the degree of his crime in committing the homicide, and the homicide would be manslaughter and not murder.

**4.   Same—Perfect Right of Self-Defense—Justification.**—If the individual assaulted, being himself without fault, reasonably apprehends death or serious bodily·

harm to himself unless he kills his assailant, he has a perfect right of self-defense, and the killing is justifiable. But a person can not avail himself of a necessity that he has knowingly and willfully brought upon himself to afford justification for his act.

5. **Mistaken Identity and Self-Defense.** — Where the theories of defense are mistaken identity and self-defense in an attempt to illegally arrest the party killed, the homicide can not be of less grade than manslaughter, though done upon reasonable apprehension of danger.

6. **Law of Retreat — Necessity for Charge on, When, and When Not.** — Whenever the question of justifiable homicide is raised by the evidence, the court should instruct the jury in regard to the law of self-defense and retreat (Penal Code, arts. 573, 574), but the doctrine of retreat is not applicable to cases of imperfect right of self-defense.

APPEAL from the District Court of Colorado. Tried below before Hon. George McCormick.

No brief on file for appellant.

We copy below the entire brief of *R. H. Harrison*, Assistant Attorney-General, for the State, which contains a brief statement of the case, as well as his confession of error, as follows, viz.: "Appellant was convicted of murder in the second degree, upon a charge of murder in the second degree, and given five years in the penitentiary. Succinctly stated, these are the facts: Appellant was summoned by the constable to assist him in making an arrest of a party, a negro by the name of Lawson, who it was expected would attempt to kill a woman at Alleyton on the night this homicide occurred. The constable and his *posse*, of whom appellant was one, repaired to the place where Lawson was supposed to be secreted, and where a horse was tied near a thicket, to wait for Lawson to make his appearance. Some time after midnight a party came out of the thicket, saddled the horse, and started to ride away. He was hailed by the constable and commanded to halt. He did not halt, but replied, 'Who in the hell are you?' and pulled his pistol and fired two shots at the constable and one of the *posse*, a man by the name of Hall; whereupon the constable and some of his *posse* fired a volley, killing the party, who turned out not to be Lawson, but a white man by the name of Weishun. It was shown in the evidence that deceased was filled with buckshot, that Hall was the only man in the *posse* who had a gun, and that at the time of the shooting the appellant and another one of the *posse* were standing one hundred yards or more from where the shooting occurred, and they, supposing the party to be Lawson, whom they were trying to arrest, and that he had fired upon the *posse* and was trying to make his escape, fired their pistols in the air to turn him back in the event he should come that way. It was shown that the night was so dark that you could not distinguish a white man from a negro even at a very close distance.

"The foregoing is substantially all the evidence upon which the State secured the conviction. The court in its charge failed to define implied malice and murder in the second degree. It also failed to charge all the law of self-defense, in that the jury were not instructed that the parties were not bound to retreat when fired upon by the deceased, before making resistance. The court erroneously charged upon a preconcerted agreement between the constable and his *posse* to kill, when there was no evidence in the case justifying or calling for such a charge.

"Because of the errors and omissions in the charge of the court, and because there was no evidence adduced upon the trial connecting appellant in an *unlawful way* with the homicide, the State here confesses error."

DAVIDSON, JUDGE.—Appellant was indicted for and convicted of murder in the second degree.

On the night of July 27, 1891, about 12 o'clock, Constable Burtschell and his *posse*, appellant being one of the number, shot and killed Earnest Weishun. The deceased rode into the town of Alleyton about dark and hitched his horse, took his saddle off, and laid it on the ground, and disappeared until about midnight, when he returned, mounted his horse, and rode off north up the street. After proceeding a short distance he was shot and killed by Burtschell and his *posse*. The wounds in his body were located as follows: "Five shot-holes a little to the right of left shoulder; five below shoulder, a little in the back, came out a little to right of left nipple; one shot in the left leg, about the ankle. There were eleven wounds in the body. * * * The shot entered left shoulder; a bullet entered left leg between knee and ankle, and came out in front." The witnesses testified, that they thought these wounds were caused by buckshot, except the one in the leg, which was made by a pistol ball of 44 or 45 caliber. All the shots entered from the rear. Weishun's horse was also shot in the left hip. The body was found lying in the street about thirty or forty steps from where the firing parties were located.

Witness W. C. Davidson testified, that he was justice of the peace, and Burtschell was his constable; that Burtschell came to him for some advice some time previous to the killing, on the same night. He said to witness, "I have been informed that a negro man by the name of Frank Lawson has threatened to kill a negro girl before Saturday night, and is here in town for the purpose of carrying out his threat; that he (Frank Lawson) has hitched his horse near the woman's house in a clump of trees;" that he (Burtschell) had recognized the horse as belonging to Mr. Weishun, the deceased, but thought the negro Lawson had stolen the horse and rode him there; and wanted witness to tell him (Burtschell) what he had best do. Witness told him to go and get

two good men that he could depend on. Burtschell said he had already summoned John Hall and Tom Carter. Witness then told him to get two good white men. Burtschell then asked the witness if the man should run when he attempted to arrest him must he shoot him. Witness said, "No;" he would have no right to shoot him. Burtschell then asked witness what must he do if the man should shoot at him first. Witness then said that would show that the man meant something wrong.

Deceased's whiskers were very nearly white. Deceased was a white man and Lawson a negro. Burtschell went off, and about midnight the shooting occurred. This witness further said, he "could not tell how many shots were fired; a volley first, then some other shots. Do not know how many."

About 1 o'clock that night, and about an hour after the shooting, the appellant, Walter Neal, August Burtschell, John Hall, and Mr. Morris came to witness. He saw no arms on them. When there Neal said, in the presence of defendants, that something terrible had happened. "We have killed old man Weishun." Burtschell said, that when deceased rode out into the road he (Burtschell) asked, "Who is that?" when deceased said, "Who in the hell are you?" and fired two shots at him (Burtschell). Burtschell said, at the time he thought he had been hit. Burtschell said that he had been told that Lawson was coming that night to kill the negro woman; that he thought Lawson had stolen the horse, and had come to carry out his threat against the woman.

Morris testified, that he was some five or six hundred yards away from the firing, and heard two shots fired first, and, "after a little intermission, then a regular volley." He got up, dressed, and went on down by the body of deceased and around to witness Davidson's, and failing to find anybody, returned along the same street about half an hour later, and met the defendants, four in company, and asked them what had happened. Jake Burtschell, brother of August Burtschell, who had got with defendants after the shooting, said, "An awful thing has happened;" that old man Weishun had been killed by mistake for Frank Lawson. This was in the presence of defendants. August Burtschell said, "The deceased pulled down a pistol and fired twice right in my face. I thought I was killed."

Sheriff Townsend testified, that defendant Carter told him that he had got a pistol from Mr. Jake Burtschell, and that he (defendant) fired two shots and Chapman fired one; that all defendant did was under August Burtschell's direction. "I saw a bullet-hole in the leg. It went in behind, and was a pistol-ball hole, 44 or 45 caliber. It broke both the bones in the leg. * * * I had ten, fifteen, or twenty searching for a pistol. We made diligent search all around and over

in the cotton-patch for arms, and I inquired of everybody, black and white, if any person had seen any pistol. We found no pistol."

Other witnesses testified to the same effect, and it is uncontradicted that no pistol was found about the scene of the difficulty or on the body of deceased.

It was shown by all the witnesses that deceased was never known to swear or use such language as was imputed to him; that he never owned or carried a pistol or gun, and was afraid of guns and pistols and never fired them; except one witness, who said he had a conversation with deceased "about two or three years ago, about carrying arms. * * * I asked deceased, was he not afraid to go through the woods at night, and especially when he had money. He replied that he was always prepared to defend himself, and especially when he had money." It appears also that deceased was in the habit of loaning money, and sometimes carried it about his person.

Defendant testified that he was summoned by Burtschell to help arrest a man supposed to be Frank Lawson. He fully described the location of the different parties preparatory to the arrest, placing himself on a side street near where the body was found, in company with Chapman, and about fifty yards from Burtschell and Hall. Hall was armed with a shotgun, and the others with pistols.

At the time of the shooting, from the evidence of defendant and Neal, it appears the deceased was riding along the street going north toward where he lived. He lived nine miles from town, and was well known to all the parties. Defendant testified: "When deceased got opposite Burtschell and Hall, they halted him. Burtschell asked, 'Who is that?' The man on horseback answered, 'Who in the hell are you?' and the man on horseback pulled a pistol and fired twice. Then I heard other firing in the direction where Burtschell and Hall were stationed. I then fired one shot in the air to scare him, and prevent him from coming by where we were. * * * The night was so dark I could not tell a white man from a negro across the road." He denied telling Townsend that he fired twice. Defendant's character was put in issue, and shown to be bad. He was a violent and dangerous man. There was no warrant in the hands of any of the party for the arrest of Lawson. This is the substance of the testimony.

There were several questions raised by appellant upon the charge of the court. The important question to our minds raised by the facts is, Did the court err in omitting to charge upon the law of manslaughter? Without recapitulating the evidence to support the State's theories, it was a question whether or not defendant's theories of the attempted arrest were true. It was evidently a contention on the trial that the deceased was shot at some distance from the firing party, as he quietly rode up the street; that he made no resistance, and had nothing to resist with, being unarmed; and that the story of defendant was manu-

factured for the purpose of affording an excuse for killing Frank Lawson. If this be correct, and Frank Lawson had been killed, it would have been murder of the first degree, and hence, in killing Weishun through mistake, the parties would be guilty of murder. The charge upon this theory was given.

Defendant's position is, that when the party was halted for the purpose of arresting him he fired upon them, and the constable's *posse* returned the fire and killed him. This may or may not be true, but does it not call for a charge on manslaughter? If defendant is correct, the attempted arrest was illegal. They had no warrant for the arrest of either party, and knew of both of the suspected felonies long before they undertook the arrest, and the constable so stated to the justice of the peace prior to the homicide. Before undertaking the arrest, it was incumbent upon them to secure a warrant; for, if honest in their belief that Lawson intended the death of the woman, or had stolen the horse, they knew it long prior to the attempted arrest, and there was ample time to secure such warrant. This was sometime prior to the homicide.

Now, if the killing was superinduced by any other cause or motive than resistance to their attempt to arrest Lawson, the killing would be murder; or, had they intended to use the occasion as a pretext on their part to kill Lawson, then the killing would still be murder. But on the other hand, suppose they only intended to arrest him, and were making the attempt illegally and without a warrant, the offense might be of no higher grade of homicide than manslaughter.

As said in Meuly's case: "A general, and, as we believe, a most humane and just, rule in the trial of one charged with murder is, that the jury should, as far as possible, judge of the facts surrounding the homicide from the standpoint of the defendant. In order to do this properly, they must have submitted to them in the charge of the court all the law legitimately and fairly arising upon the evidence which he has adduced in his defense. If the evidence be legal, competent, and admissible, then, when the court has admitted it, whether the court may believe it true or false makes no difference, it becomes a part of the case, and the jury alone have the right to say, under appropriate instructions pertinent to it, what degree of credibility shall be accorded the witnesses who have testified, and what weight shall be given to the testimony; and they also have the right to pass upon all issues legitimately arising upon such testimony. The statute enjoins it, that the charge shall distinctly set forth the law of the case." 26 Texas Ct. App., 274, 302. Again, as was said in Partlow's case, and quoted approvingly by this court in Meuly's case: "The assertion of the doctrine that one who begins a quarrel or brings on a difficulty with the felonious purpose to kill the person assaulted, and accomplishing such purpose is guilty of murder, and can not avail himself of the doctrine of

self-defense, carries with it, in its very bosom, the inevitable corollary that if the quarrel be begun without a felonious purpose the homicidal act will not be murder. To deny this obvious deduction is equivalent to the anomalous assertion that there can be a felony without a felonious intent; that the act done characterizes the intent, and not the intent the act." The State v. Partlow (Mo. Sup.), 4 S. W. Rep., 14; Reed v. The State, 11 Texas Ct. App., 510; Peter v. The State, 23 Texas Ct. App., 684; Meuly v. The State, 26 Texas Ct. App., 274, 305, 306.

Now, if the intent of the defendant was only to make an illegal and unwarranted arrest, this would not constitute a felony. If the arrest had been accomplished, it would have constituted only false imprisonment on the part of defendant, and in this State this is but a misdemeanor.

The fact that the party arrested, or sought to be arrested, without warrant, may be shown to have been justly suspected of felony, will not justify a homicide on the part of the officer, if he had no warrant, unless he bring himself within some of the rules laid down authorizing such arrest without warrant. Staples v. The State, 14 Texas Ct. App., 136; Jacobs v. The State, 28 Texas Ct. App., 79; Ex Parte Sherwood, 29 Texas Ct. App., 334.

An officer having lawful authority to make an arrest may, on meeting with resistance, use such force as may be necessary to overcome such resistance, but he is not authorized to use greater force than is necessary for the arrest and detention of the accused party. Beaverts v. The State, 4 Texas Ct. App., 175; Giroux v. The State, 40 Texas, 97.

But this rule does not apply where the officer, in violation of law, undertakes to arrest a party without a warrant, nor in cases where he has not the right to make such arrest. As we have seen, the defendant was engaged in attempting to make an unlawful arrest. Now, it is clear that he was in the wrong, because he was engaged in the attempt to perpetrate false imprisonment, and on account of that wrong was placed in a situation where, taken most strongly in his favor, it was necessary for him to defend himself against an attack made upon himself superinduced by that wrong. In such case the law justly limits his right of self-defense, and regulates it according to the magnitude of that wrong.

In Reed's case, White, P. J., said: "Whenever a party by his own wrongful act produces a condition of things wherein it becomes necessary for his own safety that he should take life or do serious bodily harm, then, indeed, the law wisely imputes to him his own wrong and its consequences, to the extent that they may and should be considered in determining the grade of the offense, which but for such acts would never have been occasioned. Mr. Bishop says: 'The rule is commonly stated in American cases thus: If the individual assaulted, being him-

self without fault, reasonably apprehends death or serious bodily harm to himself unless he kills the assailant, the killing is justifiable.' 1 Bish. Crim. Law, sec. 865.   But a person can not avail himself of a necessity which he has knowingly and willingly brought upon himself. The State v. Neeley, 20 Iowa, 108; Adams v. The People, 47 Ill., 376; The State v. Starr, 30 Mo., 270; The People v. Hunt, 59 Cal., 430; Wills v. The State, 73 Ala., 362; Barnett v. The State, 100 Ind., 171; Story v. The State, 99 Ind., 413.   That is, it will not afford him a justification in law.   How far and to what extent he will be excused or excusable in law must depend upon the nature and character of the act he was committing and which produced the necessity that he should defend himself.   When his own original act was a violation of law, then the law takes that fact into consideration in limiting his right of defense and resistance while in the perpetration of such unlawful act.   If he was engaged in the commission of a felony, and to prevent its commission the party seeing it, or about to be injured thereby, makes a violent assault upon him, calculated to produce death or serious bodily harm, and in resisting such he slay his assailant, the law would impute the original wrong to the homicide, and make it murder.   But if the original wrong was or would have been a misdemeanor, then the homicide growing out of or occasioned by it, though in self-defense from an assault made upon him, would be manslaughter under the law." Reed v. The State, 11 Texas Ct. App., 509, 517, 519; Penal Code, art. 49.

Defendant's theories of defense in this case were mistaken identity and self-defense.   In Peter's case Judge Hurt said: "The defenses interposed are mistaken identity and self-defense.   For the purpose of this opinion, the former will be considered as though Leck Crook had been the subject of the homicide."   In that case the deceased was mistaken for Leck Crook, as the deceased in this case was mistaken for Lawson.   "It will be further assumed as true," says that opinion, "that deceased at the time the fatal shot was fired was indicating by some act done a purpose to kill appellant or do him some serious bodily harm.   The question then arises, how far, under the circumstances, did the right of self-defense attach?   *   *   *   Having then killed Leck Crook (or his legal equivalent) in the attempt to illegally arrest him, the homicide can not be of a less grade than manslaughter, though done upon reasonable apprehension of danger.   The slayer in such case stands in the attitude of a trespasser, his situation being analogous to that of him who provokes the difficulty, or furnishes the occasion therefor, in the course of which he slays his adversary to save himself."   Peter v. The State, 23 Texas Ct. App., 684, 687; King v. The State, 13 Texas Ct. App., 277.

"Cases may arise in which an original trespasser, or one who provokes or furnishes the occasion for a difficulty, becomes entitled to the right of full and perfect self-defense.   But this right being forfeited

or abridged by his own act, it must be revived by his own act; as where one condones the trespass or wrong by retiring from the difficulty in an unequivocal manner, and his adversary then renews the combat. In such case, the nature and character of the original trespass or provocation enters as an element in illustrating the *animus* of the party renewing the difficulty, and fixes the grade of the offense committed in its progress." Peter v. The State, 23 Texas Ct. App., 684.

The principles and rules of law above announced are well settled by the decisions of this court as well as the great weight of authority. They are applicable to the evidence in this case as disclosed in the statement of facts, and a charge in accordance therewith should have been given the jury.

It is suggested by the Assistant Attorney-General, in his confession of error, that the law of retreat is not given in charge in connection with the law of self-defense. Whenever the question of justifiable homicide is raised by the evidence, the court should fully instruct the jury in regard to the law of self-defense and retreat as enunciated in articles 573 and 574 of the Penal Code; but the doctrine of retreat is not applicable to cases of imperfect self-defense, and hence its omission is not error in this case.

It is contended that the evidence is insufficient to support the verdict and judgment against the appellant. We do not concur with him in this contention, but refrain from discussing the testimony, in view of another trial of the case.

For the errors indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Judges all present and concurring.