## Ex parte J. W. FINNEY.

No. A-4223.   Opinion Filed March 18, 1922.
(205 Pac. 197.)

(Syllabus.)

1. **Arrest—Officers Making Arrests Without Warrant—Duty to Avoid Use of Violence.** Peace officers, having, or assuming to have, authority to make arrests without a warrant, must exercise such authority with discretion, as the law directs, so as not to jeopardize the lives and lawful pursuits of innocent people. Peace officers are as much amenable to the law as other persons, and they must not use their official authority as a cloak to violate the law. Even where a suspected person has committed a felony, an officer will not be justified in taking life where the arrest can be made without violence.

2. **Same—Arresting for Felony upon Suspicion—Reasonable and Probable Gounds.**—Where officers or others have authority to make arrests upon suspicion that a felony has been committed, to claim protection under the law there must be reasonable and probable grounds for that suspicion. Suspicion without cause can never be an excuse for such action. The two must both exist and be reasonably well founded.

3. **Same—Homicide—Officer not Justified in Killing a Person Fleeing.** A peace officer will not be justified in killing a person sought to be arrested who fled from him, where the officer acted on a mere indefinite suspicion, and no felony had in fact been committed.

4. **Same—Habeas Corpus—Homicide—Unexplained Act of Posse Shooting into Unidentified Automobile Occupied by Unknown Persons.** In an application for bail, where it appears that several shots were fired at close range by the officer's posse into a moving unidentified automobile occupied by unknown persons, on suspicion that the driver of the car may have committed a felony, killing two innocent women, the presumption arises that the

members of the posse intended the ordinary and probable consequences of such shooting.

(a) Under such unexplained circumstances the shooting would indicate an intent to kill or maim and at least evinced a depraved and malignant purpose, regardless of human life, which may amount to murder.

5.    **Same—Homicide—Person Assisting in Illegal Arrest in an Illegal Way Resulting in Killing Held Responsible Though Fatal Shots Fired by Others.** If an attempted arrest is unlawful and without justification, each person participating will be held responsible for the illegal acts of the others done pursuant to a common criminal design, in this case a design to consummate an illegal arrest in an illegal way. The common purpose need not be to commit the particular crime that was in fact committed. The leader of a band of men engaged in an illegal undertaking cannot escape criminal responsibility on the ground that he himself may not have fired the fatal shots.

Application by J. W. Finney for habeas corpus to be admitted to bail pending two charges of murder. Writ denied.

Claud Duval and Tom W. Neal, for petitioner.

Geo. Short, Atty. Gen., and R. E. Wood, Asst. Atty. Gen., for the State.

BESSEY, J. This application for a writ of habeas corpus is made for the purpose of having this petitioner admitted to bail on two charges of murder pending against the petitioner in the district court of Kay county, Okla., wherein it appears that two innocent women were killed when this petitioner and several other men attempted to make an arrest of the driver of an automobile in which the deceased women were passengers.

The salient facts in the record before us disclose that on the evening of the 11th of January, 1922, the jailer at Newkirk, then in charge of the sheriff's office, telephoned to the central office at Kaw City, about 18 miles distant, to get some officer to talk to the jailer. Later some person, whose name the jailer did not remember, talked to the jailer, stating that he was a commissioned officer. The jailer told this per-

son that there was a Hudson Super-Six car headed that way, driven by a man with about a week's growth of beard and wearing a fur cap, and that he (the jailer) had information that it might be a whisky car or a "wet car," suggesting that the Kaw City officer give it, as the jailer expressed it, "the once over."

The person who received this telephone communication at Kaw City was a Mr. Hungerford, who went to a moving picture show, where he found the petitioner, Finney, and informed him concerning the jailer's message. At this time the petitioner was city marshal, and also had a commission as deputy sheriff. These two, with several others, procured two cars and drove out towards Newkirk, and at a point near the Indian Agency called Washunga they parked their cars across the road, one on either side, so that other cars passing would be compelled to pass between the two, through a space just wide enough to permit passage. Here and in this manner these parties awaited the coming of the suspicious car. Presently another posse was organized and armed in Kaw City, and they in another car came to the place where these two cars were parked. About this time the exhaust of a moving car was heard in the distance, and this last car with several occupants, detoured in that direction towards Newkirk. Soon after a Ford car, without lights and with the curtains drawn, slowly approached the place where the two cars were parked across the road, followed by a third car, which had detoured to its rear.

There were six occupants in this closed Ford car: Burril Rhoten, the driver, living near Kaw City; Mrs. Bousman, a neighbor; Mrs. Skinner, another neighbor; Mrs. Bliss, of Tulsa, Okla., and her little daughter; and Irvin Dubock, a young man employed in the neighborhood—none of whom were accused of violating any law. They had left Newkirk on their

return trip home a little after dark. Eight or nine miles out of Newkirk their lights went out, and for that reason they were traveling slowly, and arrived at Washunga, where the two cars were parked, about 9:30. As the driver approached the space between the two parked cars he shifted gears into low and proceeded very slowly, in order to pass through between the cars without striking either, which he did, without being interrogated here by any of the posse there assembled. When the third car following arrived, a moment later, some one of the party said. "That looks like a suspicious car." Thereupon the petitioner and a man named Butler got on the running boards of this third car, a Ford coupe, and drove past and ahead of this party of six in the closed Ford a short distance, where they stopped close to the side of the road, leaving their engine running. Butler and the petitioner dismounted and stood in or near the beaten tracks in the road, and it is claimed that they commanded the driver of the approaching closed car to stop. At this time a number of the posse were following closely in the rear, in one of the cars that had been parked, as before stated. If the petitioner or Butler commanded the driver of the closed car to stop, the driver either did not hear the command or was afraid to comply with the demand, in the belief that they were about to be robbed. However this may be, the driver of the closed Ford failed to stop, and as the car passed the coupe near where Butler and the petitioner stood both fired their pistols, and several shots penetrated the body and top of the closed car from the rear, one shot killing Mrs. Bousman instantly, and another shot fatally wounding Mrs. Skinner, resulting in her death a few hours later. The record shows that in all six or seven shots were fired, and that five or six penetrated the car containing the six occupants, the shots entering the body and top of the car at from three to six feet above the ground. Whether any of these shots were fired

by any of the occupants of the car following does not clearly appear. Mrs. Bliss' testimony was, in part, as follows:

"Q. Just relate the facts surrounding the shooting, the killing of Mrs. Bousman and Mrs. Skinner. A. Well, I came to Kaw City Tuesday night to visit my sister Mrs. Bousman, and she wasn't at home; she was at Newkirk visiting my sister Mrs. Marcus; and Brother had to send to town to get some things, and Mrs. Skinner, my brother's wife, and I came with Burril Rhoten especially to get my sister and take her back, so I could visit with her before I went home; and we came up in the afternoon, and we started back very peaceably, and when we got out about eight miles of town we burned the lights out; I just can't tell exactly, between eight and ten miles; and we had then to drive very slow because we were in the dark. It was moonlight. We could see fairly well, riding along very peaceably. When we got to Washunga—I believe that is the place—the two cars were setting there, one on one side of the road, and one on the other, and we had to drive between very slow. We pulled in between these cars and got quite a distance when they shot into us. That is the first I knew of anything.

"Q. You had turned the corner? A. Yes, and started towards Kaw. I am not sure of the directions there at Washunga; we had turned the corner, I think.

"Q. All right; state whether there was a car following you in. A. Yes; I can't just say positive, but about a mile before we turned the corner there was a car dropped in behind us, a Ford car with very bright lights. I hoped the car would stay behind us till we got home; it helped to light up the road for us; the lights were wonderful that was on that car; and this car followed us. * * *

"Q. Did you notice any one in the road ahead of you before the shooting, a short while before the shooting took place? A. There was a man stood beside the big car we passed.

"Q. Did you hear any one make any cries for you to stop?' A. No, sir; nothing whatever. I heard nothing till I heard the reports of the gun.

"Q. Where were you sitting? A. In the back seat, on the left side.

"Q. Do you know which shots, numerically speaking, killed Mrs. Bousman and Mrs. Skinner? A. Well, both shots— one shot didn't kill them both. The third shot killed Mrs. Bousman, my sister, and the next one followed on and killed my sister-in-law, Mrs. Skinner.

"Q. That would be the third and fourth shots? A. Yes.

"Q. Are you acquainted with Mr. Finney, the defendant here? A. No, sir.

"Q. Did he come close to the automobile after the shots, after the shooting had taken place? A. Yes.

"Q. Did you there have a conversation with him? A. Yes; he demanded us to get out of the automobile.

"Q. And you got out? A. Yes.

"Q. And did he make a search of your person? A. Well, Mr. Dubock was the first one to get out of the car, and he ran his hands down over his person, his trousers and his coat.

"Q. Is he the only one? A. He put his hands on me to search me, and I asked him to step back, not to touch me, and he started back; I asked him not to put his hands on me.

"Q. What did he say? A. He says, 'Rather cute, aren't you?' I said, 'If you rob me, you'll have to kill me like you have the two women in the car.' 'Killed two women?' he said. I said, 'Yes; you have killed my two sisters.'

"Q. Then what did he say? A. He told me to get back in the car and get to town as quick as we could and get aid.

"Q. You got in the car? A. I stood on the running board, and rode the car in because there was hardly room in the car after the women were killed.

"Q. You rode on the running board? A. Yes.

"Q. Did you see him any more that evening? A. Yes, sir.

"Q. Where? A. Well, at the big hotel in Kaw; I believe it is the Frisco Hotel.

"Q. Santa Fe? A. The big hotel; I am not acquainted there; right across from the garage.

"Q. You saw him there? A. Yes.

"Q. Did you have any conversation with him relative to the shooting? A. I did; yes.

"Q. What did he say to you? A. I jumped off from the car and went into the hotel and asked for the law. Several people came to me and asked me what was the trouble. I told them I wanted help; that some one had held us up and killed my two sisters. Some one said, 'There is the law, in the car.' They pulled up to the sidewalk and I said, 'Are you the law?' He said, 'I am.' I said, 'Well I want help; somebody held us up out here and killed by two sisters.' He says, 'I'm the guy, I'm the law and the man that done the shooting, and what in the hell are you going to do about it?'

"Q. Did you have any other conversation? A. No, sir.

"Q. What did you do then? A. I went home, up to my brother's.

"Q. Did you see him after that? A. No, sir."

Parts of the testimony of Burril Rhoten, the driver of the car, were as follows:

"Q. Just state to the court, all the facts surrounding the shooting. A. Well, we had come up here after Mrs. Bousman and started back. We didn't leave here until somewheres around 8 o'clock. It was nice and warm, so we wasn't in any hurry to get back. We got down something like a mile west of Washunga and turned east, and as we turned east there was a car turned in behind us. We drove along slow; we hadn't

any lights; the lights burned out up on the hill; and we were driving along slow and got over to Wash. There was a couple of cars parked there. One was, setting across the road facing the north, and the other one was setting on the north side of the road, facing the east. There was just barely room to drive in between these cars. I came down on the south side of the road, and I had to stop and look the situation over. It kind of looked suspicious. I really didn't understand what it all meant or anything about it, so I swung out a little bit to the left and kind of turned in between the two cars. I must have been there about a minute; just stopped and looked it over, how to get through; so I drove on through, and there didn't any one say anything or try to stop us or anything, so we turned south into Kaw City and got down the road just a little ways—

"Q. How far? A. Well, something like 300 yards, probably, maybe something near 350 yards, and this car passed us and drove down about 50 yards.

"Q. Was that the car that had been following you all along? A. Yes; they drove on by us about 50 yards, and a couple of men got out and stepped over in the road. I was coming on down. I just figured—I couldn't see to tell who it was, but I figured it was a holdup or something. We drove on up within about 20 feet of them, and I put my car in low and drove up just as slow as I possibly could, and when I was about 20 feet of them they stepped out of the road and let me pass. I drove along in 4 or 5 feet of them, and when we got by something like 15 or 20 feet they commenced shooting at us. When they commenced shooting, I stopped, and they come on down to the car.

"Q. How many shots were fired, if you know? A. There must have been six or seven, anyway; not over seven. * * *

"Q. Did you hear any command given to stop your car? A. I did not.

"Q. He was within 15 feet of you when he stepped out of the way of the car, and he let you go on by, or did he not? A. Yes.

"Q. Did he make any motion of any kind? A. No, sir.

"Q. Any indications that he wanted you to stop? A. No, sir."

Dr. Barker, the physician who examined Mrs. Skinner before she expired, said the bullet entered her head at the back part of the skull and lodged somewhere in the head. The hole was large enough to admit the first finger of his hand.

Dan A. Bain, the sheriff, testified in part as follows:

"Q. State your name. A. Dan A. Bain.

"Q. You are the sheriff of this county? A. Yes.

"Q. Did you have occasion to converse with the defendant, Finney, on the—shortly after the 11th day of January of this year, over the death of one Mrs. Dick Skinner and Mrs. Bousman? A. Yes, sir.

"Q. Will you relate that conversation to the court? A. It was the next night or next morning after the shooting; he told me he did the shooting; that he was the only one that did any shooting out there that he knew of."

Part of the testimony of Paul M. Mead was as follows:

"Q. You are deputy sheriff of this county? A. Yes, sir.

"Q. Do you have that gun with you? A. Yes, sir. (Produces gun.)

"Q. I hand you Plaintiff's Exhibit A and will ask you to state what it is and where you got it and to whom it belongs, if you know. A. It is a 45 double action Colt's.

"Q. Where did you get it? A. Mr. Finney.

"Q. How long after the shooting? A. Well, I just don't know exactly what time it was when we got home here.

"Q. Did you have a conversation with him, or did he in your presence state anything about the killing down at Kaw

City? A. Well, not a great deal. I asked him what he did the work with.

"Q. What was his answer? A. This one here, this 45.

"Q. Were there any shells in it at the time you got it? A. I think there were; yes.

"Q. It was loaded? A. Yes."

On the hearing of this application for bail the petitioner testified that after the tragedy he decided that, since he was an officer, he had a better chance of acquittal than the others connected with the affair would have, and that he gathered several of them together in a car and went some distance into the country, where they held a conference and where it was agreed that the petitioner, Finney, was to assume all the responsibility for the fatal shooting, and the facts should be so reported by all connected with it, and that in accordance with this agreement Finney stated to the sheriff and deputy sheriff that it was he who fired the fatal shots, but that in truth and in fact he (Finney) fired but two shots, and these two were fired into the ground as the car containing the six persons passed.

Under the facts and conditions as recited it becomes the duty of this court to determine whether the proof is evident or the presumption great that petitioner, Finney, is guilty of murder.

The zealous, lawful efforts of peace officers in apprehending criminals should be commended and encouraged. With more or less personal risk to themselves they protect our lives, our homes, and our property. On the other hand, those having or assuming to have such authority must exercise it with discretion, as the law directs, so as not to jeopardize the lives and lawful pursuits of innocent people. Peace officers are as much amenable to the law as other persons, and they must not use their official authority as a cloak to violate the law. Even

where the suspected party has committed a felony, an officer will not be justified in taking life where the arrest can be made without violence. State v. Coleman, 186 Mo. 151, 84 S. W. 978, 69 L. R. A. 381; Williams v. State, 44 Ala. 41; Georgia v. O'Grady, Fed. Cas. No. 5,352; notes State v. Phillips (Iowa) 67 L. R. A. 299, 310; Jackson v. State, 66 Miss. 89, 5 South. 690, 14 Am. St. Rep. 542; 5 C. J. 424.

The petitioner here and his associates acted on an indefinite telephone message from the jailer to "look over" a supposed whisky or "wet" car, a Hudson Super-Six. The name of the driver and the number of the car were unknown. The information, as it reached the petitioner, did not even disclose the factory name of the car, whether it was a Hudson or a Ford, or some other kind of a car, and petitioner did not know and made no inquiry as to whether in fact a felony had been committed.

Here was a closed Ford car, whose occupants were unknown to the arresting party, and this car had just passed the members of the party unmolested. The parties sought to be arrested were surrounded on all sides by the meandering Arkansas river, Kaw City, and this armed posse, equipped with three cars. There was no excuse or occasion to use violence, because, if there had been a purpose on the part of the driver to resist arrest, under these conditions their escape was impossible and the use of violence, under any pretext, unnecessary. These people had committed no crime, and they had a right to resist an illegal arrest, though the proof here indicates that no resistance was in fact made. Notes and annotations State v. Hunter, 8 L. R. A. 535.

If the driver of this suspicious car was suspected of transporting whisky, he would be suspected of a misdemeanor only, and no officer without a warrant would have the right to forcibly make his arrest, unless the offense was perpetrated in

his presence. The law on this point is so well settled that extended authorities need not be cited. See notes State v. Hunter, supra.

Where officers or others have authority to make arrests upon suspicion that a felony has been committed, to claim protection under the law there must be reasonable and probable grounds for that suspicion. Under such circumstances an officer must not act arbitrarily, but must exercise his discretion in a legal manner, using all reasonable means to avoid mistakes. State v. Coleman, 186 Mo. 151, 84 S. W. 978, 69 L. R. A. 381; 5 C. J. 416, notes 17 Ann. Cas. 900; notes Wiley v. State, L. R. A. 1918D, 379.

No one, whether private person or officer, has any right to make an arrest without a warrant in the absence of actual belief based on actual facts creating probable cause of guilt. Suspicion without cause can never be an excuse for such action. The two must both exist and be reasonably well founded. People v. Burt, 51 Mich. 199, 16 N. W. 378; People v. Gordon, 40 Mich. 716. An officer making an arrest on authority of a telegram or private message does so at his peril. Janes v. Wilson, 119 La. 491, 44 So. 275.

In the case of Chandler v. Rutherford, 101 Fed. 774, 43 C. C. A. 218, a deputy marshal, Adams, with three other persons assisting him, armed themselves for the purpose of arresting one Flave Carver, suspected of horse larceny. It was thought that Carver was in the vicinity of the town of Muskogee. Between 8 and 9 o'clock in the evening this posse came stealthily upon James Chandler, who was walking with a lady at the north end of Cherokee street in Muskogee, and without making any proclamation of their character or purpose some one of them called, "Hey, there!" Chandler stopped for a moment, and in answer to an inquiry from the lady explained it as his opinion that there were some boys in the

grass, and when Chandler and the lady had walked a few steps farther the same call, "Hey, there!" was made by some member of the deputy marshal's posse. Chandler then stopped, and as he was turning around some member of the posse fired upon him, the bullet penetrating the side of his head and face. These officers or assumed officers had no warrant or process for the arrest of the thief, and had no knowledge or information whatever as to who the person was whom they were attempting to arrest, and under the circumstances had no grounds for believing that Chandler had committed a felony, and in fact he had committed no offense.

The case of Snead v. Bonnoil, 166' N. Y. 325, 59 N. E. 899, was a case where a person having rightfully in his possession articles of silver and jewelry in a satchel took them to a pawnshop and asked for a loan of money thereon. Not being able to obtain the amount he asked, he left the pawnshop, and with his satchel of valuables was returning to his home, when a peace officer came up behind him and touched him on the shoulder, saying: "What have you got in that bag?" The owner of the bag turned and saw two men who were strangers to him and replied: "None of your business. Take your hand off my shoulder." One of the men said: "We are officers, and you are under arrest." The man inquired upon what charge he was being arrested, and the officer replied: "We want to know what you have in that bag." The arrest was for a felony, and the officers did not have reasonable grounds for believing that the plaintiff had committed a felony.

The case in which the facts most nearly resemble the facts in the case here under consideration, so far as we have been able to find, is the case of Wiley v. State, 19 Ariz. 346, 170 Pac. 869, L. R. A. 1918D, 373, wherein it was held that the facts and circumstances did not constitute reasonable and probable grounds for an arrest for the suspected felony without a war-

rant, and we think the facts in the case at bar show even less reasonable grounds for making an arrest than did the facts and circumstances in the Wiley Case. The facts in the Wiley Case, briefly stated, are these:

About 12 o'clock at night the sheriff's office at Tucson received a telephone call from Pastime Park, about three miles distant, that "a woman had been robbed of $2,000 worth of jewelry and half beaten to death," and asking that an officer be sent out at once. The sheriff secured an automobile and directed two deputy sheriffs and a policeman and the driver of the car to go to the park, look the matter over, and report to him by telephone at the sheriff's office. This party proceeded towards the park, and overtook James Bates and his wife, who were riding in a car on their way to their home beyond the park. The Bates car suddenly turned north towards the park, and the officers then directed the driver of their car to speed up, which was done. Coming upon or near the Bates machine, the officers claimed to have called in a very loud voice, "Stop! we are officers." This was repeated several times, they say, but received no attention or recognition from the occupants of the car. Both cars were shown to have been running with the cut-outs open, and the Bates car had chains which were making a rattling, flapping noise when the car was running. One of the officers testified:

"I then took my pistol and fired a shot towards the wheel, trying to puncture a tire. For what purpose? To stop the car. Why to stop the car? To find out who the parties were in the car."

He testified further that he fired another shot in the same direction, a second or two after the first shot. Other shots were fired by others in the party. The Bates car then came to a stop about 25 feet in the lead.

Bates testified that he and his wife were returning home along the highway, running at the rate of·about 25 miles an hour, and that when not very far from Pastime Park his wife remarked that a car was following them. He looked back and saw the lights of a car about 300 yards in the rear. A little farther on his wife said, "Pull out of the road and let the machine pass." They gradually did so, when he heard a noise which he thought was a blow-out or a shot. He immediately applied the emergency brake and threw the car into neutral, remarking, "We have a blow-out." His wife then said, "I 'am shot." By this time the radiator of the officers' car overlapped the tailboard of the Bates ·car, and stopped about 25 feet to the left. The officers pointed their revolvers in his direction, and one stood guard while two others overhauled the car and two boxes that were in the rear of the car. They stated that they were officers and had instructions to search the car for booze. Bates said to them, "You have shot my wife." One of them answered, "That is G—d—d nonsense." Another said, "Oh, h——, she is just scared to death." Mrs. Bates died soon, afterwards. The officers went on, to the park and busied themselves in looking for the woman who was supposed to have been robbed and beaten. When they later learned that Mrs. Bates was dead, they telephoned the sheriff's office and surrendered·

It was held, under the above circumstances, that the officers should have known that the command to stop was not heard because of the noise of the cars; that, before, the officers had a right to forcibly stop the Bates car, the surrounding facts and circumstances should have been such as to induce in the mind of a reasonably cautious and prudent person the belief or well-founded suspicion that the occupants of the car had committed a felony. These officers did not know the name or have any description of the person accused of committing the felony. Their sole and only reason for suspecting

the occupants of the Bates car was the fact that they believed that the car was coming towards them and turned suddenly when overtaken and refused to stop when spoken to, and that the facts here shown do not constitute ordinary care and prudence such as should have dictated the course pursued by these officers—citing People v. Kilvington, 104 Cal. 86, 37 Pac. 799, 43 Am. St. Rep. 73, and Petrie v. Cartwright, 114 Ky. 103, 70 S. W. 297, 59 L. R. A. 720, 102 Am. St. Rep. 274, from which is quoted:

"We have been unable to find any common-law authority justifying an officer in killing a person sought to be arrested, who fled from him, where the officer acted upon suspicion, and no felony had in fact been committed."

See, also, notes and annotations to the Wiley Case, supra.

The petitioner admits the killing of two innocent women by some member or members of his posse. The evidence is clear and uncontroverted that two bullets penetrated and passed through the back curtain of the car from the rear, about midway between the upper portion of the body and the top; that two other bullets passed through the metal portion of the body, from the rear, about eight inches above the seat; and that one or two other bullets passed through one of the back side doors of the car. These physical facts would indicate that the person or persons who fired these bullets intended to kill or maim, or at least evinced a depraved and malignant purpose, regardless of human life. The rule is well settled that every man intends the ordinary and probable consequences of that which he purposely does.

The petitioner now claims that he did not fire the fatal shots; that the shots which penetrated the car and caused the death of these two innocent women were fired by Butler or possibly other members of the posse. At first the petitioner admitted that he alone did the killing, to protect the others, and

later he changed his story. However this may have been, it seems to us that they were all engaged in an unlawful undertaking, and that the leader of the party cannot justify on the ground that he himself did not fire the fatal shots.

If this attempted arrest was unlawful and without justification, each person participating will be held responsible for the illegal acts of the others done pursuant to a common criminal design—in this case a design to consummate an illegal arrest in an illegal way. The common purpose need not be to commit the particular crime that was in fact committed. If two or more persons join in a purpose to commit a crime (in this case an illegal arrest), each of them, if present, is guilty as principal of any other crime committed by the others in pursuance of the common purpose or as a natural or probable consequence thereof. Wiley v. State, 19 Ariz. 346, 170 Pac. 869, L. R. A. 1918D, 373; 16 C. J. 128; 5 R. C. L. 1003; Spies v. People, 122 Ill. 1, 12 N. E. 865, 17 N. E. 898, 3 Am. St. Rep. 320·

This brings us up to the question of the degree of the crime, whether it was murder or manslaughter. In the Wiley Case, supra, it was held that the offending officer was guilty of murder in the second degree. The provisions of the Criminal Code of Arizona of 1901 are as follows:

"172. Murder is the unlawful killing of human being with malice aforethought. Such malice is expressed or implied. It is expressed when there is manifested or deliberate intention unlawfully to take away the life of a fellow creature. It is implied where no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.

"173. All murder which is perpetrated by means of poison or lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery,

burglary or mayhem, is murder of the first degree, and all other kinds of murder are of the second degree.''

It will be seen that our statutes differ from the Arizona statutes in this respect. Under our statutes there is but one degree of murder and murder may be committed in any one of three ways, namely:

(1) By a premeditated design to effect the death of the person killed.

(2) When done in a manner imminently dangerous to others and evincing a depraved mind, regardless of human life, without a premeditated design to kill any particular person, or any person.

(3) When done without a design to kill by a person engaged in the commission of a felony.

Section 2317, R. L. 1910, provides that homicide by an act imminently dangerous to others and evincing a depraved mind is none the less murder because there was no actual intent to injure others. It would seem, therefore, that if the statutes of Arizona had classified homicide and murder as our statutes do, the offending officers in the Wiley Case would have been guilty of murder, as defined by our statutes.

In Texas, Colorado, and Missouri, where the crime is by statute divided into first and second degree murder, the latter being where there is implied malice, it has been held that the killing of an innocent person by an officer while attempting to make an arrest without a warrant, on suspicion and without probable cause, is at least murder in the second degree. Carter v. State, 30 Tex. App. 551, 17 S. W. 1102, 28 Am. St. Rep. 944; State v. Coleman, 186 Mo. 151, 84 S. W. 978, 69 L. R. A. 381; Roe v. State, 55 Tex. Cr. R. 128, 115 S. W. 593.

As we view it, there was substantial evidence in the case here under consideration supporting each of our three statutory methods of committing murder, and especially the second. The firing of six shots into the top and body of an unidentified closed car, occupied by six persons and moving along the public highway, by officers seeking to make an arrest without a warrant, as we see it, evinces a depraved mind, regardless of human life.

The application is therefore denied.

DOYLE, P. J., and MATSON, J., concur.