## R. C. PAMPLIN v. STATE.

No. A-3801. Opinion Filed March 29, 1922.
(205 Pac. 521.)

(Syllabus.)

1. **Arrest—Peace Officer Jeopardizing Life by Discharging Firearms When Making Arrest for Misdemeanor.** A peace officer in attempting to make an arrest for an offense less than a felony has no right to discharge firearms, where the shooting may jeopardize the life of the person sought to be arrested or the lives of innocent bystanders, unless the offender places the officer in danger of his own life or of suffering great bodily harm.

   (a) Except for their own safety, police officers should be made to realize that they have no right or authority to discharge firearms to arrest offenders violating or suspected of violating police regulations.

2. **Same—For Protection of Parties Making Arrest, Necessity for Well-Founded Belief that Felony Has Been Committed.**—Even where officers or others have authority to make arrests upon belief than a felnoy has been committed, to claim protection under the law there must be reasonable and probable grounds for that belief. Belief without cause can never be an excuse for such action. The two must both exist and be reasonably well founded.

3.  **Homicide—Instruction on "Culpable Negligence" Approved.**
"Culpable negligence," as applied to this case, was properly defined as follows: "Culpable negligence is the want of that usual and ordinary care and caution in the performance of an act usually and ordinarily exercised by a person under similar circumstances and conditions, and you are instructed that a person handling a deadly weapon will be required under the law to use a higher degree of care and circumspection than if using an instrument ordinarily harmless."

Appeal from District Court, Oklahoma County; Edward Dewes Oldfield, Judge.

R. C. Pamplin was convicted of manslaughter in the second degree and sentenced to imprisonment in the state penitentiary for four years, and he appeals. Affirmed.

J. Q. A. Harrod and Giddings & Giddings, for plaintiff in error.

Geo. F. Short, Atty. Gen., and E. L. Fulton, Asst. Atty. Gen., for the State.

BESSEY, J. R. C. Pamplin, plaintiff in error, in this opinion referred to as the defendant, was by information filed in the district court of Oklahoma county on July 7, 1919, charged with the crime of murder. At the trial, November 5, 1919, defendant was by a verdict of the jury found guilty of manslaughter in the second degree, and later a judgment was rendered in accordance with the verdict. A motion for a new trial was filed, considered, and overruled, and the defendant in due time prosecutes this appeal.

On the night of the homicide, June 22, 1919, defendant Pamplin was, or assumed to be, a plain-clothes policeman, doing special police duty in Oklahoma City, operating under verbal instructions from Mayor Walton and other subordinate police officers. He had no written authority or commission to act in that capacity and seems to have been a kind of assistant po-

liceman, to aid others in making arrests. On this night, at about 10 o'clock, defendant had made an arrest of one Helena, and had stopped with his prisoner in front of the Noll Hotel on West Second street in Oklahoma City for the purpose of permitting Helena to procure cash to make his bond. While defendant and Helena were there in a Ford automobile, C. A. Smith, an employee of the city fire department, passed in an Overland automobile, driving, so defendant says, at an excessive rate of speed. Helena, the driver of the Ford car, was instructed by the defendant to speed up and pursue Smith, which they did. In so doing they passed from Second street into Broadway, where they turned north. When they were between Third and Fourth streets on Broadway, going north, the defendant while standing on the running board of the Ford car, then a short distance in the rear of the Overland car, fired his 45 double-action revolver, as he says, at one of the tires of the Overland car for the purpose of causing the driver to stop. This shot passed on beyond the Overland car and killed an innocent young man, Lyman Crane, who happened to be crossing the street near the middle of Broadway at the intersection of Fourth street.

There is evidence showing that before the shooting the defendant shouted to Smith, the driver of the Overland car, to stop. Smith said he did not hear any command to stop; that he heard defendant call and looked back over his shoulder and saw defendant wave his hand, and supposed it was a friendly salutation from a certain acquaintance whom he took defendant to be. When the shot was fired, Smith turned his car towards the curb and stopped. According to the testimony of Smith, the defendant then came up and got on the side of his Overland car and accused him of running without a tail light. Defendant then asked Smith what his business was, and Smith replied that he worked for the city the same as the defendant.

did, but in a different department. Defendant then said, "Let's go to the police station," which Smith consented to do. Before arriving at the station, the defendant got out and looked at the tail light and saw it was burning, whereupon he ordered Smith to go on home and go to bed and forget about it.

No charge was lodged against Smith at the police station, then or later, charging him with the commission of a misdemeanor or any other crime. Smith denied that he was running at an excessive rate of speed, in which he was corroborated, to some extent, by other disinterested witnesses. There was no evidence that Smith had committed a misdemeanor, except the uncorroborated testimony of the defendant himself. The evident self-interest of the defendant, coupled with the fact that he made no effort then or any time to lodge a complaint against Smith for driving at an excessive rate of speed or for driving without a tail light, indicated that his testimony on this point was of little probative value.

The testimony shows further that at this time there were a number of pedestrians on and crossing this street; that North Broadway at this point is one of the most frequented thoroughfares in Oklahoma City.

The errors complained of, worthy of consideration, relate to the instructions of the court defining the different degrees of homicide and the language of the court in defining culpable negligence and the doing of the act without authority of law, in a manner imminently dangerous, with a reckless disregard of human life.

Several of the questions of law involved in this case were recently discussed at length and decided by this court in the case In re Habeas Corpus of J. W. Finney, 21 Okla. Cr. 103, 205 Pac. 197. For the sake of brevity and to avoid full analy-

sis of the questions here at issue, reference is made to that case.

Under our statutes there is but one degree of murder, and "murder" may be committed in any one of three ways, namely:

(1) By a premeditated design to effect the death of the person killed.

(2) When done in a manner imminently dangerous to others and evincing a depraved mind regardless of human life, without a premeditated design to kill any particular person, or any person.

(3) When done without a design to kill, by a person engaged in the commission of a felony.

"Manslaughter in the first degree" may be committed in either of two ways, one of which is "when perpetrated without a design to effect death and in the heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide."

"Manslaughter in the second degree" is defined as "any killing of one human being by the act, procurement or culpable negligence of another, which, under the provisions of this chapter, is not murder or manslaughter in the first degree."

Under the conditions disclosed in this record, there was evidence supporting a charge of murder under the second and third subdivisions of the statute defining murder; there was evidence to support the charge of manslaughter in the first degree, under the second subdivision recited in that statute; and there was evidence to support the charge of manslaughter in the second degree as defined above, and as found by a verdict of the jury in this case.

By a great preponderance of the evidence here the person sought to be arrested was guilty of a misdemeanor only, if he

was guilty of anything, and the defendant himself was in the act of committing a felony when he fired the fatal shot. The defendant, after a long experience as a policeman in the Barbary Coast district and elsewhere, knew or should have known that he had no right to shoot a deadly firearm on one of the most frequented thoroughfares of a city in attempting to arrest for an offense which was at most only a misdemeanor. In an early case in this court, Sharp v. U. S., 6 Okla. Cr. 350, 118 Pac. 675, it was held that a peace officer in attempting to make an arrest for an offense less than a felony has no right to shoot, unless the offender resists to such an extent as to put the officer in danger of his own life or suffering great bodily harm. The use of firearms under the circumstances here was attended with probable moral consequences to the person sought to be arrested and with jeopardizing the lives of innocent bystanders. In such a case, where death ensues, the crime is murder or manslaughter, depending upon motive, intention, or deliberation, as the case may be. The law always presumes that a person intended the probable and natural consequences of his deliberate act. Tyner v. United States, 2 Okla. Cr. 693, 103 Pac. 1057; Ex parte Finney, supra.

The best police officers are those who use their guns the least. Many innocent lives would be saved yearly if police officers could be made to realize this fact. They have no right or authority to discharge deadly firearms to arrest offenders violating or suspected of violating police regulations. The law does not contemplate the discharge of firearms for such a purpose excepting only for the police officer's own safety; and, if a police officer violates the law in this regard, he will be held accountable criminally, like other people, for the fatal consequences of his illegal acts. Police officers are to be commended in their zealous efforts to enforce the law, but in so doing

they must themselves keep within the bounds of the law, as more elaborately discussed in the Finney Case, supra.

Even where officers or others have authority to make arrests upon belief that a felony has been committed, to claim protection under the law there must be reasonable and probable grounds for that belief. Belief without cause can never be an excuse for such action. The two must both exist and be reasonably well founded.

The trial court failed to instruct the jury as to the law covered in the second subdivision of the statute defining manslaughter in the first degree. In our opinion, the facts here justified the giving of such an instruction. It may be when the defendant fired the fatal shot he had no design to effect the death of any one; but it was done illegally and without cause, by means of a deadly weapon, under circumstances indicating that it may have been done in the heat of passion. This, however, was an error in favor of the defendant of which, for that reason, he has no cause for complaint.

The defendant complains of the court's instruction defining "culpable negligence," as follows:

"(12) If you have a reasonable doubt that the defendant is guilty of the crime of murder as herein submitted to you, then you must inquire as to whether or not he is guilty of the crime of manslaughter in the second degree. And if you find and believe from the evidence, beyond a reasonable doubt, that the defendant did, in Oklahoma county, state of Oklahoma, on or about the 22d day of June, 1919, unlawfully shoot and kill the deceased, and if you find and believe from the evidence beyond a reasonable doubt that the act of shooting under the circumstances was culpable negligence on the part of the defendant, without evincing a depraved mind, then you will find the defendant guilty of manslaughter in the second degree and assess and declare his punishment therefor.

"And in this connection, you are instructed that any person convicted of manslaughter in the second degree is punishable by imprisonment in the penitentiary for not more than four years, or not less than two years, or by imprisonment in the county jail not exceeding one year, or by a fine not exceeding $1,000, or by both such fine and imprisonment.

"(12½) 'Culpable negligence' is the want of that usual and ordinary care and caution in the performance of an act usually and ordinarily exercised by a person under similar circumstances and conditions, and you are instructed that a person handling a deadly weapon will be required under the law to use a higher degree of care and circumspection than if using an instrument ordinarily harmless."

Instruction No. 12½, as given above, was given in the language requested by the defendant. In addition to this definition of "culpable negligence," defendant requested the following, which was refused:

"By 'culpable negligence" is meant guilty, censurable, reprehensible, wrong, sinful. In other words, manslaughter in the second degree must be some criminal act which is not covered by murder or manslaughter in the first degree. But in any event, it must be some act which the law abhors as a crime, for no man can be convicted for mere negligence, but it must be criminal negligence."

While the definition requested may not have been incorrect, the words "guilty," "reprehensible," "sinful," and words of the same or similar import, are susceptible of multitude of interpretations. What one juror might consider sinful another might deem entirely harmless. Instead of elucidating the meaning of the term "culpable negligence," the requested instruction would more likely have confused the jury. Like the terms "reasonable doubt," "police power," and "res gestae," the definition is often more difficult to understand than the naked term itself. The court having

instructed the jury on culpable negligence, as requested, did not err in refusing to define the term further in the language requested, as last above quoted.

This court, in the case of Kent v. State, 8 Okla. Cr. 188, 126 Pac. 1040, has approved the instruction given in the instant case, verbatim, and this is a definition which is hard to improve upon and one which may be safely followed by trial courts.

The errors, if any there were material to the issues in this case, seem to have operated to the advantage of the defendant. Under the evidence here, the defendant might well congratulate himself that he was not convicted of murder or manslaughter in the first degree.

The judgment of the trial court is affirmed.

DOYLE, P. J., and MATSON, J., concur.