## LEOTIS ALTIZER v. STATE.

No. A-3784. Opinion Filed April 15, 1922.
(205 Pac. 1106.)

### (Syllabus.)

1. **Arrest—Rights and Duties of Officers Arresting Without Warrant.**—For discussion of the rights and duties of peace officers in making an arrest without a warrant, see body of opinion.

2. **Assault and Battery—Evidence Insufficient to Support Conviction.** —Evidence examined, and held insufficent to support the verdict, as the uncontradicted and apparently credible evidence discloses that defendant acted in defense of himself and domicile.

Appeal from District Court, Pittsburg County; Harve L. Melton, Judge.

Leotis Altizer was convicted of assault with a dangerous weapon with intent to do bodily harm, and he appeals. Reversed.

A. C. Sewell, for plaintiff in error.

The Attorney General and E. L. Fulton, Asst. Atty. Gen., for the State.

MATSON, J. This is an appeal from the district court of Pittsburg county, wherein, on the 13th day of December,

1919, plaintiff in error, Leotis Altizer, hereinafter referred to as defendant, was convicted of the crime of assault with a dangerous weapon with intent to do bodily harm after trial on an information charging defendant with having shot one George McKee with intent to kill him. The jury returned a verdict of guilty of the lower degree of felonious assault, but could not agree upon the punishment, and the court thereafter sentenced the defendant to 15 months' imprisonment in the state penitentiary.

The shooting occurred in the town of Quinton in Pittsburg county about 8 o'clock in the morning of the 4th day of April, 1917. Defendant was released upon bond, and the cause was continued from time to time until June, 1919, when the defendant was arrested and placed in jail on another offense. The sheriff made the defendant a trusty, and in July, 1919, the defendant escaped, and was not apprehended again until October, 1919, when he was found at his former place of residence, Quinton, and returned to jail and there incarcerated until his trial in December following.

Defendant was a veterinary surgeon with an office in the upper floor of a two-story building facing west on a public street in the town of Quinton immediately above a millinery store in said town. He had lived in Quinton several years, had never been charged with any crime, either felony or misdemeanor, and, so far as this record shows, had borne a good reputation as a law-abiding citizen in said town.

The prosecuting witness, George McKee, claimed to be deputy town marshal by selection of the town council without any commission or other written authority evidencing his appointment, although he claims to have executed an official bond as such deputy officer. J. R. Crow was the town marshal of Quinton at that time. Some month or two before this

shooting McKee, who ran a livery stable in that town, and the defendant had some trouble, and McKee had ordered the defendant not to come upon his premises. A Ft. Smith & Western train passed through the town of Quinton going east between the hours of 10 and 11 at night. On the night before this shooting the defendant had gone down to the depot, and when the east-bound train came in he walked around and talked to the engineer, who was at that time oiling the engine. Defendant says Crow, the town marshal, and McKee, the deputy, came around to where he was talking to the engineer and ordered him to go home, and defendant said that he "would not go until he got ready; that they had no right to make him go home; that he was not bothering anybody and was only talking to a friend." McKee, in detailing what occurred at the depot, says that he saw the defendant "walk around on the far side of the train, and that he and Crow went around there, and defendant was talking to the fireman or engineer." Crow said that he believed defendant was getting a little whisky, and said, "Let's walk around there;" that they then walked around within six or eight feet of Altizer, but said nothing to him; that after that Altizer got in Jim Haden's car and went back towards town, and that he and Crow walked around on Main street, and he had started west on Main street towards his livery stable and heard two shots fired; that these shots sounded like they were behind the Hinton Building, which was across the street from the defendant's office and was in the direction that Crow had gone; witness, although an officer, made no effort to investigate this shooting; that the next morning he was at his livery barn, and Fred White came down there and told him that Crow had sent for him; White said that Crow and Altizer were "having some shooting up at Altizer's office"; McKee then went into the barn office and got his shotgun (which was loaded with buckshot), and started up the street to Al-

tizer's office, and on the way met Tom Noblin, and Noblin told him Crow was needing him up there, to hurry up; they then walked together to the corner where Hill's store is, which is across the street from Altizer's office, when some one behind him holloed, ''Look out, George!'' that he then looked up towards the stairway and up towards Altizer's window and threw his gun up and pointed it in that direction; that he did not see anything, but immediately was shot from the upstairs window, and thereupon he shot through the window; that some of the shot coming from the window hit him in the left leg above the knee, in the left wrist, and in the muscle of the left arm and in the lower part of the neck; that they were No. 8 shot; that Tom Noblin, who was walking a little way in front of him, was also shot. As to the first shot coming from the window of Altizer's office, the witness McKee is corroborated by the testimony of Tom Noblin.

Defendant says that on the morning after he was accosted by Crow and McKee at the depot he was told by several persons that he named that Crow and McKee were looking for him with shotguns and said they were going to kill him; that he immediately went to his office for the purpose of calling up the sheriff at McAlester and asking him to come and protect him; that while he was at the telephone trying to get the sheriff he heard somebody come up the stairway, knock on the door of the office and ask if he was there, and, immediately upon replying that he was, a shot from a shotgun was fired through the front door of the office, lodging in the wall close to where he was standing; that this sudden attack upon him in his office and home (the evidence showing that he also slept in a room up there) greatly frightened and flustered him; that he was not apprised of the purpose of the person who knocked on his door; that said person did not inform him that he was an officer or that he desired

to arrest him for any offense, and that he only asked if he was in there and immediately fired at him through the wooden door; that after the sudden attack was made upon him he grabbed a shotgun that was there in his office and shot back through the door for the purpose of frightening the person away and protecting himself and his premises; that after he shot back through the door he heard the person go back down stairs, and he immediately went out in the hallway and up towards the front part of the building into another office; that in a few moments he returned to his office and was walking by the front window thereof with his shotgun in his hand for the purpose of putting it back where he kept it when two shots were suddenly fired from the outside through the south front window of his office; that the glass from the window fell all over him and he thought he was shot; that he immediatedly dropped down between the two windows and fired a shot in the general direction from which these two shots had come; that he could not see who he was shooting at, but believed it was an attempt on the part of Crow and McKee to assassinate him. It was this shot fired from the front window that struck both Noblin and McKee, and it was on this evidence that the defendant was convicted. After the defendant had fired the shot out of his window and while he was still in his office, and without any evidence to show that there was any attempt being made to arrest him for any offense whatever, he was bombarded from all directions and all sides from 30 to 52 shots having been fired up through the floor into his office. But defendant escaped injury by retiring into another part of the building. Some three hours afterwards the sheriff of the county arrived upon the scene, and the defendant came out of his office upon being told that the sheriff was there, and he was then arrested for shooting the prosecuting witness with intent to kill him. No charge

was ever lodged against him for having shot the two shots the night before, nor is there any evidence that Crow had any warrant of arrest or was attempting to arrest the defendant without a warrant for that shooting or any other crime when he went up to the defendant's office on the morning of the shooting armed with a shotgun. The evidence is undisputed, however, that Crow left the town of Quinton about two or three weeks after this shooting without resigning as city marshal and has never returned to that community since.

While it is to be regretted that an innocent person was shot in this melee by the same load that hit the prosecuting witness McKee, we think it would be a travesty upon justice amounting to an abridgment of the natural rights of a person to defend himself and his domicile to let this conviction stand. That Crow first assaulted the defendant by shooting through the door of his domicile is not disputed. That the prosecuting witness McKee armed himself with a shotgun loaded with buckshot and went to the scene of the trouble, on being told that Crow and the defendant were "in a shooting scrape," without ascertaining whether Crow was attempting to arrest the defendant, or without making any further investigation of the controversy, is admitted. While Crow and the prosecuting witness were officers, even if they were attempting to make an arrest in this case, which fact clearly does not appear from any testimony in the record, they were acting beyond the scope of their authority conferred by law as held in several recent opinions of this court. Ex parte Finney, 21 Okla. Cr. 103, 205 Pac. 197; Pamplin v. State, 21 Okla. Cr. 136, 205 Pac. 521. And see, also, Sharp v. U. S., 6 Okla. Cr. 350, 118 Pac. 675.

It is not the purpose or intention of this court to restrict or impede peace officers who make arrests or attempt to make arrests legally. The statute in plain and unmistakable terms provides the circumstances under which officers can legally

make arrests without a warrant. This statute is applicable to all civil peace officers, whether acting under state, county, or municipal authority. It provides (section 5654, Rev. Laws 1910):

"A peace officer may, without a warrant arrest a person:

"First. For a public offense, committed or attempted in his presence.

"Second. When the person arrested has committed a felony, although not in his presence.

"Third. When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it.

"Fourth. On a charge, made upon reasonable cause, of the commission of a felony by the party arrested."

Section 5657, Id., also provides:

"When arresting a person without a warrant, the officer must inform him of his authority and the cause of the arrest, except when he is in actual commission of a public offense, or is pursued immediately after an escape."

From the foregoing provisions it is seen that the first duty of an officer in attempting to make an arrest without a warrant (where the arrested party is not taken in the actual commission of the offense or has escaped and is immediately pursued) is to inform the person to be arrested of his authority in so acting and the cause for so acting. If this simple provision of the statute were more closely observed by arresting officers (as it should be), we are convinced there would be much less trouble in making arrests without a warrant. The American people are very jealous of their fundamental right to personal liberty. They have ingrafted in every document of organic law, from the inception of this govern-

ment to the present day, provisions against unreasonable searches and seizures, and when peace officers, in plain violation of these fundamental rights, assume authority in making arrests, not given by statute, their actions and conduct will receive close scrutiny by the courts and condemnation when deserved. The fact that they are peace officers, sworn to support and enforce the law, should caution them to be more careful in its observance. Either wanton disobedience of our laws or lack of observance of them by petty peace officers is ofttimes a moving cause for willful disrespect for the law by unthinking persons, and leads to anarchy, mob violence, and a reign of terror in such communities.

On the other hand, it is the plain duty of the judiciary to support and protect those peace officers who act within their authority in making arrests and otherwise attempting to enforce the penal statutes of this state. In no other way may the peace and dignity of the state be maintained and the judgments of its courts enforced. This court fully realizes the importance of lawful law enforcement and is ever ready to extend its protecting arm thereto, but illegal arrests or attempted arrests cannot be sanctioned or even tolerated merely under the cover of a peace officer's commission.

The fact that the defendant was not placed upon trial for more than 2½ years after his arrest is significant. In the interim between the time of his arrest and trial some of his witnesses had died, others had left the community, and others had enlisted in the army. Defendant says that he was led to believe that he would never be prosecuted for this alleged offense, and, had it not been for his betrayal of trust in escaping from the custody of the sheriff after his arrest on another offense, we seriously doubt if this charge would ever have been pushed to trial.

Defendant contends that the verdict is not supported by sufficient evidence, that the uncontradicted evidence shows that he was assaulted in his domicile unlawfully, and that all he did was done in his apparent necessary defense of himself and his domicile. We are of opinion that the events happening both prior and subsequent to the particular shooting for which the defendant was convicted clearly support his theory that there was no good-faith effort on the part of these officers to arrest him for a crime, but that the conduct of Crow was malicious and the result of animosity held against him, and that the verdict was more the result of prejudice and passion on the part of the jury, created largely because an innocent man was injured and also because the evidence disclosed that the defendant had escaped from jail. We are of the opinion that there is merit in these contentions; that this judgment should not be permitted to stand upon this evidence; that, as heretofore stated, it would be a travesty upon justice and an abridgment of the fundamental right of a person to defend himself against an unlawful attack upon his person and domicile.

For reasons stated, the judgment is reversed.

DOYLE, P. J., and BESSEY, J., concur.