JAMES R. HARGUS v. STATE.

No. A-8925.   Dec. 3, 1935.
Rehearing Denied Dec. 20, 1935.
(54 Pac. [2d] 211.)

J. M. Hill, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

EDWARDS, J. Plaintiff in error, hereinafter called defendant, was convicted in the district court of Tulsa county of murder and his punishment fixed at death.

The homicide which forms the basis of this charge occurred in this manner: Defendant, who had formerly been convicted on a federal charge in Texas, came to Tulsa and at about 11:30 at night parked his car near a drug store and went into it and made some small pur-.chase, then went away for a few minutes and returned and made inquiry, and so acted that the employees feared a holdup. The manager sent a messenger boy by the back door to phone the police. Defendant left the drug store

and went to his car parked a short distance down the street, and about this time two police officers, W. L. Martin and L. B. Mitchell, the deceased, in a police car, came to the drug store, parked, and walked down the street to where defendant was getting in his car. One of them called to him to wait a minute, and they walked up to the car and defendant said in substance: "You had better get away from here or I will kill you." As Martin came up to the car, defendant kicked open the car door violently into Martin's face, striking him on the nose and in the eye, and as Martin fell back from this blow defendant shot him in the region of the stomach, the bullet passing through his body. Defendant then shot Mitchell, inflicting two wounds which caused his death in a few seconds. Martin, after he was shot, immediately opened fire, as also did Mitchell. Defendant received two serious wounds which disabled him and he was detained by Martin until other officers arrived at the scene. Defendant was taken to police station, and there made a statement in substance that "he was so hot that he couldn't afford to be taken alive"; further saying he was under indictment in Texas. The following morning he talked with a newspaper reporter, who testified to the following conversation:

"A. I asked him if he would mind telling me about the shooting of the night before and he indicated he would not mind and proceeded to tell me that he had gone to the drug store, in his own words, to take the place—to take the joint, and after he arrived there he said, apparently it was not quite ready, so he stalled around awhile and then he indicated he might have changed his mind about taking the joint and walked over to his car. Then he said he saw a car drive up and two men got out of it. He said he noticed that it had a Texas license on it. He said those two men walked over to his car and he said he kicked the door open and put the heat on 'em. Then he said, I told the men, 'I don't want to get hurt and I don't want to

hurt you,' then he said that he thought—he wasn't sure— he thought he saw one of the men with a gun. He said, if I knew he had a gun I knew that would be the end of me, so I started blasting. I believe that is all pertaining to what happened there."

Dee Southern, a witness for the state, saw the homicide from where he stood on a porch about 20 feet away. He testified:

"Q. All right, now, you say the two police officers got down to the car; now did you see what happened after they got down to the car? A. Well, the only thing I saw them, both went up on the same side of the car— Q. Which side of the car did they go up on? A. The left-hand side of the car; the car was facing east on Latimer and they both walked up on the same side of the car and the next thing I noticed, one of them ran behind the car and said 'I am shot,' and he grabbed his side. * * * Q. All right now, after the officer said he had been shot what happened? A. Well, I yelled for the officers to get around the corner of my porch; it is a concrete porch—it was a concrete porch, so about that time the other officers, they started back up the street, both officers were coming back up the street and he backed up behind the car, pulled his gun and started shooting. Q. Do you know which officer that was? A. It was the one that was killed."

Defendant, in his own behalf, testified as follows:

"I stopped here on Latimer going east and walked across the street and walked in this drug store and ordered a coca cola. I ordered this coca cola and turned around, I paid for the coca cola and turned around and ordered a package of gum. I paid for that and walked directly out the front door of the drug store, turned to my left and I hesitated on the corner, and lit a cigarette and walked right across to my car and just as I got in my car, well there was someone says, 'Hey, wait a minute, Buddy.' That is all that was said. I got in my car and turned around and looked and I didn't recognize the men, but I had seen the car from Texas, and they made an

attempt to draw their pistols. Well, whenever they did that—well, I just thought, well, to save my own life I have got a pistol, I will just shoot them."

Defendant sought to justify the killing on the ground of self-defense. The court instructed fully and correctly on the law of murder, manslaughter in the first degree, and self-defense.

The first contention is that no proper judgment has ever been entered. Upon this point the record is that after motion for new trial had been overruled, the court informed defendant the fact of the charge of the crime of murder by information, the plea of not guilty thereto, the trial on such charge, the verdict of guilty by the jury, and then asked defendant if he had any legal cause to show why judgment and sentence should not be pronounced; then stating that none appearing he pronounced judgment that defendant be transported to the state penitentiary for the purpose of execution by electrocution as provided by law; that he was remanded to the custody of the sheriff to be transported and to be delivered to the warden, and the day of execution was fixed. The signed minutes of the court, attested by the clerk, are slightly more brief, stating motion for new trial was presented, heard, and overruled, exceptions taken, notice of intention to appeal given, time for appeal fixed, then "upon the verdict returned by the jury finding the defendant, James R. Hargus, guilty of the crime of murder as charged in the information and fixing his punishment at death, the defendant was sentenced by the court to be delivered to the state penitentiary at McAlester, within ten days and said defendant, James R. Hargus to be executed on Friday, the 8th day of March, 1935, by electrocution, according to the death warrant." The record then contains a death warrant setting out the verdict in full and a recital of

the proceedings in full. The applicable provisions of law are sections 3134, 3136, 3146, and 3170, Okla. Stat. 1931. We deem it unnecessary to quote them. There is some slight confusion, in that the judgment entered on the 8th day of December, the date of the proceedings just referred to, is erroneously combined with and designated as a death warrant. It contains all the requisites of the statute, is signed by the judge and attested by the clerk, with the seal of the court, and is sufficient. This irregularity is purely technical and does not affect any substantial right of defendant and affords no reason for a reversal. In this connection, however, it is well to say that in cases of felony, and particularly those involving capital punishment, the county attorney and the trial judge should examine the statutes and strictly conform thereto.

Next it is argued the evidence is insufficient to sustain the judgment, in that it discloses the killing was in self-defense. As stated, the issue of self-defense was submitted to the jury, but defendant argues the officers were without authority to arrest defendant, that he was engaged in the commission of no crime, and there was no reasonable cause for believing him to have committed any felony, nor was there any charge of the commission of a felony such as to warrant an arrest under section 2780, Okla. Stat. 1931; that the officers had no warrant and did not inform defendant of their authority and of his arrest, as required by section 2783, Okla. Stat. 1931. It is not the law that a peace officer or any other person, if he makes an inquiry of any person, not having at the time a warrant, does so at the peril of death. In this modern time, when automobile travel permits persons to cover long distances in a short time, it is not unlawful for a peace officer, nor for a private citizen, to make a reasonable inquiry of strangers or others and at the least a mere

accosting or inquiry does not permit the person so accosted, in the absence of a reasonable apprehension of immediate danger, to open fire and then justify on the ground the officer or citizen was without authority. This does not limit the duty of an officer, before making an arrest, to inform the person sought to be arrested of his authority and the cause of his arrest. Here no opportunity was given the officers to state their authority or the purpose of their inquiry. Altizer v. State, 21 Okla. Cr. 229, 205 Pac. 1106; Annotation, State v. Hunter, 8 L. R. A. 535; Roberson v. United States, 4 Okla. Cr. 336, 111 Pac. 984; Heinzman v. State, 45 Okla. Cr. 305, 283 Pac. 264; Robsion v. State, 53 Okla. Cr. 178, 9 Pac. (2d) 54; Oglesby v. State, 56 Okla. Cr. 286, 38 Pac. (2d) 32; 2 R. C. L. 474, art. 32. These cases mainly refer to an arrest or attempted arrest by a known officer, but since a wide latitude is given a private citizen to make arrests, it is a salutary rule that the mere accosting of a person by even a private citizen will not justify a deadly attack by the person accosted unless there is a reasonable apprehension of danger, and if the person so accosted does attack and kill an officer or citizen without such reasonable apprehension, the lack of authority in the person killed does not reduce the killing from murder to manslaughter.

Complaint is made that the county attorney was guilty of misconduct. This is predicated on the single question of the defendant on cross-examination if the car in his possession at the time was stolen. No objection or exception was taken, and the defendant answered that it was his wife's car. Counsel cite cases in which a persistent effort by the county attorney to get incompetent matter before a jury is ground for a new trial; here there was nothing behind the single question. Defendant also argues the county attorney was guilty of misconduct in inquiring

on cross-examination if defendant was wanted in Texas or if the Texas authorities were after him. The court sustained an objection. As above set out, defendant had made a statement he was "so hot he could not afford to be taken alive," and in his direct testimony one of the moving causes for resisting the officers when they approached was he had observed a Texas license tag on their car and that he had enemies in Texas. This probably justified the question if he was wanted in Texas, but in any event the sustaining of the objection rendered the matter harmless.

Some other assignments are referred to in the brief of defendant, and while they have not been overlooked, they are not of sufficient merit to require discussion. Upon the whole record we are satisfied defendant had a fair trial and that there is no reason for this court to interfere with the judgment and sentence.

The case is affirmed.

The original time for the execution having passed, owing to the pendency of this appeal, it is considered, ordered, and adjudged by this court that the judgment and sentence of the district court of Tulsa county be carried out by electrocution of the defendant on the 7th day of February, 1936.

DAVENPORT, P. J., and DOYLE, J., concur.