PEOPLE v RIVERS

1. CRIMINAL LAW—SUSPICIOUS CIRCUMSTANCES—REASONABLE INVESTI-
GATION.

A police officer is obliged to conduct some sort of investigation
when a citizen has called and voiced concern about a suspicious
car and that officer has been officially dispatched to the scene,
and the investigation may reasonably consist of talking with
the occupants of the car, asking them to identify themselves,
and inquiring about their reason for being in the area.

2. CRIMINAL LAW—SUSPICIOUS CIRCUMSTANCES—REASONABLE INVESTI-
GATION—OPPORTUNITY TO FLEE.

It is reasonable for a police officer to order a person to accompany
him while he investigates what appears to him to be an
untruthful response by that person to his questions during
investigation of a citizen's report of a suspicious car where the
person questioned has an opportunity to leave the area if the
officer proceeds to investigate alone.

3. CRIMINAL LAW—SUSPICIOUS CIRCUMSTANCES—REASONABLE INVESTI-
GATION—PLAIN VIEW.

A police officer had a right to be standing beside a car door, and
therefore had a duty to seize a pistol in the car when it
appeared in plain view, where he was conducting an investiga-
tion of a report by a citizen that the car was suspicious, had
questioned the occupants of the car about their reasons for
being in the area, had been told that they were waiting for a
girlfriend who, they said, had gone into the house from which
the call about a suspicious car had come, and, being alone, had
then requested the occupants of the car to come with him while
he checked at the house, whereupon they opened the doors, the
dome light was turned on, and he saw the pistol.

REFERENCES FOR POINTS IN HEADNOTES

[1–3] 47 Am Jur, Searches and Seizures § 18 et seq.
[3] Lawfulness of nonconsensual search and seizure without warrant,
prior to arrest, 89 ALR2d 715.
Validity, under federal constitution, of warrantless search of auto-
mobile-Supreme Court cases, 26 L Ed 2d 893.
"Plain view," observation of objects in, 29 L Ed 2d 1067.

Appeal from Muskegon, Charles A. Larnard, J. Submitted Division 3 May 9, 1972, at Detroit. (Docket No. 12434.) Decided August 30, 1972.

Ronald L. Rivers was convicted of carrying a concealed weapon. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Paul M. Ladas,* Prosecuting Attorney, and *Gerald D. Warner,* Assistant Prosecuting Attorney, for the people.

*Balgooyen, Daniels & Balgooyen,* for defendant on appeal.

Before: FITZGERALD, P. J., and HOLBROOK and T. M. BURNS, JJ.

HOLBROOK, J. Ronald Lee Rivers, defendant, was convicted in a jury trial of carrying a concealed weapon, contrary to MCLA 750.227; MSA 28.424, and appeals.

A preliminary examination was held in the matter and the defendant was bound over to circuit court for trial. A motion to suppress evidence was filed by defendant on June 23 and heard on June 28, 1971. This motion to suppress evidence was decided by the trial court based on the preliminary examination, there being no further proofs or evidence offered.[1] On June 29, 1971, the trial judge entered an order denying the motion of defendant to suppress evidence.

The defendant on appeal raises two issues which we restate and consider in proper order.

---

[1] *People v Zeigler,* 358 Mich 355 (1960).

## I.

Did the trial court properly rule on the defendant's motion to suppress evidence (two pistols) in holding that the search and seizure were reasonable and not violative of defendant's constitutional rights?

The pertinent facts brought out on the preliminary examination are as follows:

On August 24, 1970, at 9:45 p.m., Officer Haken of the Muskegon Police Department responded to a radio dispatch message to investigate a suspicious car in front of 350 Allen Avenue. Officer Haken had heard similar messages over the radio several times that afternoon describing the same "suspicious car" being in the area.

The officer approached the car matching the description, and talked to the defendant, who was seated behind the wheel. After some argument, defendant produced a bankbook as identification, and stated that he was waiting for his girlfriend who had just gone into the house and who was coming right out. The officer observed that the passenger, one Earl Russell, was leaning forward and appeared to be concealing his hands. The officer then went to the passenger side of the vehicle, observed Earl Russell's identification (a driver's license), and was given the same explanation (waiting for the girlfriend) for their presence in the area.

The officer then informed the defendant and Earl Russell as follows: "Well, if that's the truth, okay; if it's a lie I'm arresting you both under suspicious person. * * * Let's go check".

As defendant and Earl Russell opened the car doors and exited the car, the light came on, and the officer saw a gun on the floor of the front seat

where Earl Russell's feet had been. Officer Haken picked up the gun. He viewed the interior of the car again and saw a pearl handled gun lying on the floor right where the defendant had been seated.

Defendant and Earl Russell thereupon ran and other officers apprehended Earl Russell at the scene, but defendant escaped and was arrested at a later date.

Defendant contends that when Officer Haken said "Let's go check", it was an order for him to get out of the car and constituted an arrest.

The people contend that the officer was acting properly in investigating the citizen's complaint; to have failed to do so would have constituted a dereliction of duty. His suggestion or request that defendant accompany him to the house to verify his story was not an arrest but a legitimate extension of his investigation. Thus, the officer had a right to be by the car door, and evidence coming into his view could lawfully be seized without a warrant.

In denying defendant's motion to suppress the evidence (the guns), the trial court specifically referred to the case of *United States v Johnson,* 143 US App DC 215; 442 F2d 1239 (1971), as dispositive of the issue. In that case, officers made a traffic stop, and when defendants exited the car, the dome light came on, revealing capsules of suspected narcotics spilled on the car floor. In holding the evidence admissible, the Court said:

"The undisputed testimony is, rather, that the narcotics were revealed in plain view by the action of appellee Johnson in getting out of his car when approached by Officer Herring—an action which caused the car door to swing wide open, thereby turning on the car's interior dome light and revealing the narcotics lying on the car

floor on the driver's side. Thus, even if the custodial arrest for traffic violations, as distinct from the stop and the mere issuance of non-custodial citations, be considered sham, the disclosure of the narcotics was not the consequence of a search incident to that arrest." *United States v Johnson, supra,* p 219; 442 F2d 1243.

There is dictum in that case to the effect that in any event, the officer would have been entitled to approach the car, require the driver to get out, and give him a protective frisk for weapons, citing *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968).

The *Johnson* case, while helpful, is not directly on point. First, it does not answer the question whether in suggesting or requesting defendant to accompany him to the house, the officer was arresting him; and second, it does not address the question whether the officer had a right to suggest or request the defendant to accompany him and thus get out of the car, which action placed the officer where he could see the gun in plain view.

In a study sponsored by the American Bar Foundation,[2] field interrogation and arrest are distinguished as follows:

"A. Field Interrogation and Arrest Distinguished

"In this analysis the phrase 'field interrogation' is reserved for those cases in which the police conduct an interrogation in the area, usually on the street, where the suspect is found. The term 'arrest' describes the situation in which a suspect is taken into custody and down to the police station.

"In some situations, field interrogation and arrest complement each other. The major aim of a program of field interrogation is the apprehension of persons who have committed crimes. Field interrogation is thus an

[2] Tiffany, McIntyre, and Rotenberg, *Detection of Crime, Stopping and Questioning, Search and Seizure, Encouragement and Entrapment* (Little, Brown, & Co, Boston, 1967) pp 9–10, 34.

investigative device, a stage in the criminal justice system designed to separate innocent persons from those who should be subjected to the next step in the process, an arrest. The field interrogation may confirm the officer's suspicion, and an arrest will be made. In other situations, the field interrogation may produce exculpatory statements which allay the suspicions of the officer, and no arrest will be made.

"There are situations, however, in which the field interrogation produces no clear indication of either guilt or innocence. The suspect may refuse to answer, and then the officer is confronted with the difficult question whether suspicious circumstances plus a refusal to answer constitute adequate grounds for arrest or whether he may use a threat of arrest in order to induce cooperation.

\* \* \*

"6. *Citizen reports of a suspicious person.* Officers often stop a person for interrogation as the result of a call from a citizen.[20] A housewife who observes a man loitering outside her home, a proprietor who becomes wary of a man who repeatedly makes minor purchases in his store or who repeatedly observes his establishment from outside, the girl who thinks the man walking behind her at night is following her, each may contact the police and report a suspicious person. When officers receive such a report directly or receive a radio call to 'investigate a suspicious man at _____,' they will typically stop and question the person if he can be found.[21]

---

"[20] The information received may clearly indicate that a crime has been committed and that the need is to identify the perpetrator, *People v One 1958 Chevrolet,* 179 Cal App 2d 604, 4 Cal Rptr 128 (1960); or it may leave uncertain whether a crime has been committed by anyone, *Bell v United States,* [108 US App DC 169] 280 F2d 717 (1960).

"[21] This type of information was received in *Busby v United States,* 296 F2d 328 (CA9, 1961), *cert den,* 369 US 876 [82 S Ct 1147; 8 L Ed 2d 278] (1962); *Johnson v District of Columbia,* 119 A2d 444 (DC Mun App, 1956); *Gisske v Sanders,* 9 Cal App 13; 98 P 43 (1908); *People v Henneman,* 367 Ill 151; 10 NE2d 649 (1937) (informed by other police officers); *Hargus v State,* 58 Okla Crim 301; 54 P2d 211 (1935)."

---

This distinction was carefully considered by the

Supreme Court in *Terry v Ohio, supra,* 26; 88 S Ct, 1882; 20 L Ed 2d, 909:

"It does not follow that because an officer may lawfully arrest a person only when he is apprised of facts sufficient to warrant a belief that the person has committed or is committing a crime, the officer is equally unjustified, absent that kind of evidence, in making any intrusions short of an arrest."

The Court in that case was concerned with the "intrusion" of a reasonable search for weapons to protect the officer, prior to arrest. Nevertheless, the reasoning of *Terry* seems to extend beyond the facts of that case.

"It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further." *Terry v Ohio, supra,* 23; 88 S Ct, 1881; 20 L Ed 2d, 907.

"We consider first the nature and extent of the governmental interests involved. One general interest is of course that of effective crime prevention and detection; it is this interest which underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner *approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest."* (Emphasis supplied.) *Terry v Ohio, supra,* 22; 88 S Ct, 1880; 20 L Ed 2d, 906–907.

This distinction between arrests based on probable cause, and street investigations which may lead to arrests, has been fully considered in three recent cases from the District of Columbia. In *Young v United States,* 140 US App DC 333, 336; 435 F2d 405, 408 (1970), a shotgun was observed in plain view by officers investigating a suspicious car. The Court applied the *Terry* Court's reasoning to a situation resembling the instant case:

"Appellants contend that the shotgun and pistol taken from the car were the fruits of an illegal arrest and therefore should have been excluded from evidence at trial. We think no sound objection can be based on the action of the policemen in stopping the suspicious-acting car and detaining the car and its occupants for brief questioning. In *Rios v United States,* 364 US 253; 80 S Ct 1431; 4 L Ed 2d 1688 (1960), the Supreme Court suggested that, in such situations, probable cause is not required to justify a momentary detention when the police have no intention to detain a suspect beyond the requirements of routine interrogation. In *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968), the Court went further and held that a police officer may make not only a stop but also a protective frisk where he 'observes unusual conduct which leads him reasonably to conclude in the light of his experience that criminal activity may be afoot and that the person with whom he is dealing may be armed and presently dangerous. * * * ' *Id.* at 30, 88 S Ct at 1884 [; 20 L Ed 2d 911]. The power to stop a person for brief questioning was not discussed expressly but was an implied and necessary premise of the decision. *See Id.* at 32–33, 88 S Ct 1868 [; 20 L Ed 2d 912], Harlan, J. concurring. A greater invasion of the interests generally protected by the Fourth Amendment, and notably the interest in being let alone, is wrought by a frisk than by requiring someone to stop long enough to be asked a few questions aimed at clearing up suspicious circumstances. Obviously the officer is not required to meet a greater burden in justifying such a stop than in justifying the subsequent frisk."

In *United States v Lee,* 271 A2d 566 (DC, 1970), officers investigating a robbery which had occurred at an earlier date, stopped and questioned the defendant, who was acting in a suspicious manner. A frisk of defendant's person revealed a pistol. In refusing to suppress the evidence, the Court observed:

"Revealed here is the kind of momentary contact

which is and must be recognized as necessary to a sound police-community relationship and its commensurate effective law enforcement. It cannot be said that the accused was so inconvenienced or restricted that the delicate balance between individual freedom and legitimate police activity has been unduly weighted against him. Cf. *James v United States,* 135 US App DC 314, 316; 418 F2d 1150, 1152 (1969); *United States v Williams,* 416 F2d 4, 6 (CA 5, 1969); *Allen v United States,* 129 US App DC 61, 64; 390 F2d 476, 479 (1968). *See also Trilling v United States,* 104 US App DC 159, 183; 260 F2d 677, 701 (1958) (Prettyman, J., concurring in part and dissenting in part), where, in a related context, he wrote:

" ' * * * I think the rule of the cases is that the police can question a person not a suspect or one who is a mere suspect, so long as the period of detention and the mode of the questioning are reasonable under the circumstances for the purpose of obtaining information.

" 'I think the rule of reasonable-for-the-purposes-of-information must necessarily be the rule. The police must investigate crime. That much is clear; it is one of the fundamentals of organized society as contrasted with anarchy; it is part of the rule of law. Inquiry reasonable for information purposes is no part of intensive interrogation for the purpose, or with the effect, of extracting confessions.' " *United States v Lee, supra,* pp 567–568.

In *United States v Frye,* 271 A2d 788 (DC, 1970), the Court held that police officers who, pursuant to information from an unidentified citizen that a certain automobile was carrying weapons, followed the automobile and discovered that it had improper license tags, were warranted in stopping the automobile, frisking its occupants, and arresting defendant when a loaded pistol was found in his possession; thus, defendant was not entitled to have the pistol suppressed. In arriving at its conclusion, the Court noted:

"We have here another of those moving street scenes where quick, reasonable action by the police is necessary else events will pass them by with the result, perhaps, of another crime committed which could have been prevented or solved. When the unidentified citizen reported to the police an incident of this nature then taking place nearby, the police would have been derelict if they had not proceeded to the scene to investigate." *United States v Frye, supra,* p 790.

Four Michigan cases which apply the "plain view" doctrine are: *People v Kuntze,* 371 Mich 419 (1963); *People v Tisi,* 384 Mich 214 (1970); *People v James,* 36 Mich App 550 (1971); *People v Gray,* 37 Mich App 189 (1971). These cases, while helpful, are not directly on point, as they involve evidence coming into the view of an officer after he has made an arrest.

In the instant case, the action of Officer Haken appears to fit into the category of the "stopping and brief questioning" of the *Young* case; the "momentary contact" of *United States v Lee, supra;* the "moving street scene" of *United States v Frye, supra,* rather than an arrest.

The issue that must be resolved is the propriety of the officer's conduct: Whether the mode of questioning was reasonable under the circumstances for the purpose of obtaining information. See *United States v Lee, supra.* Here, the officer had information that a citizen, presumably residing at 350 Allen, had called and voiced concern about a suspicious car. Certainly the officer, officially dispatched to the scene, was obliged to conduct some sort of investigation. Since such a call would not justify tying up a police car to set up a surveillance, the only reasonable alternative seems to be to talk with the occupants of the car, ask them to identify themselves, and inquire about their reason for being in the area.

That inquiry elicited a response which did not appear truthful: that the occupants were waiting for a girlfriend who had allegedly gone into 350 Allen, the house from which the complaint had come. In the officer's words:

"*A. [Officer Haken]:* Well, I wondered why a car, why a person would give a complaint on a suspicious car and then state they had a girlfriend there. I was going to check it out more.

"*Q. [Mr. Stariha, defense attorney]:* Then the concern was checking out what that girl was going to be?

"*A.* Complaint as to who called in and why they called in if they knew this party."

Whether the officer should have continued his checking alone instead of ordering the defendant to accompany him is the crucial question. No cases on point have been unearthed.

We determine that the officer's action, if he was to take any, was reasonable—to go to the house alone to check a story which appeared to him to be untruthful, affording the defendant the opportunity to leave the area, obviously would appear absurd to the officer. If he learned, as he expected to, that the defendant was lying, then he could also expect the defendant to flee before he returned to the car, thus rendering the whole exercise somewhat futile. Because the officer's actions were reasonable under the circumstances, he had a right to be by the car door, and when the gun appeared in plain view, he had a duty to seize it. *Harris v United States,* 390 US 234; 88 S Ct 992; 19 L Ed 2d 1067 (1968).

Is the Muskegon "suspicious persons" ordinance unconstitutionally vague?

Defendant raises this issue for the first time on appeal. For this reason we are not required to

consider it. *People v Elliott,* 322 Mich 313 (1948); *People v Wasson,* 31 Mich App 638 (1971). Furthermore, the cases herein cited permit the police to reasonably investigate suspicious circumstances and the rule of law is grounded on the government interest in "effective crime prevention and detection"; an interest that exists independent of an ordinance such as Muskegon's suspicious person ordinance.

Because of our ruling that the officer's actions in the instant case were reasonable in investigating a citizen's complaint, the constitutionality of that ordinance is not vital to a decision in this case.

Affirmed.

All concurred.